J. E. WALDRON, *Admr., etc. v.* LEEVALE COLLIERIES, *Inc.*

(No. 9626)

Submitted January 16, 1945. Decided February 27, 1945.

444

L. L. Scherer, K. D. Bowers, Howard R. Klostermeyer, *Scherer, Bowers & File* and *Spilman, Thomas & Battle,* for plaintiff in error.

H. M. Kilgore, D. D. Ashworth, C. C. Sanders and *Ashworth & Saunders,* for defendant in error.

RILEY, JUDGE:

J. E. Waldron, administrator of the estate of William Edward Waldron, deceased, instituted this action in the Circuit Court of Raleigh County against Leevale Collieries, Inc., to recover damages for unlawful death, based on an alleged violation of Code, 21-6-2, prohibiting the employment of any child under eighteen years of age in any coal mine. To a judgment entered on a verdict in the amount of five thousand dollars the defendant obtained this writ of error.

The declaration, in two counts, does not allege negligence. Plaintiff seeks recovery solely upon the violation of the statute.

Plaintiff's decedent was employed by defendant as a truck driver. At the time of the injury he was helping to move new mine cars up defendant's incline track, approximately nine hundred feet in length, to a bench near the top of a hill. At the upper end of the incline was a hoist house, and at the lower, the railroad tracks of The Chesapeake and Ohio Railway Company. Near the bottom of the incline (as one faces the railroad tracks) the track divided into a "Y"—the branch to the left, called a "sand track", and the other to the right, the latter stopping at right angles to, and a few feet short of the railroad tracks. Supplies were taken up this incline on a low truck; the new mine cars, on their own trucks. This operation was carried out by means of a wire cable, which was operated by an electric motor over a drum in the hoist house. On the bench one thousand feet from the hoist house there was a mine opening. Between the two were an electric shop, a blacksmith shop, and certain supply tracks. The coal after being brought to the surface was carried some distance around the hill toward the

hoist house on a system of tracks to the head house where it was dumped, and carried on down to the tipple by means of a conveyor. The superstructure of this conveyor crosses over the incline at a considerable height as it nears the tipple.

In order to unload new mine cars, and to align them so that the wheels would be straight with the hoist track, and roll upon the tracks, the use of a snatch block was required in addition to the cable. But once a mine car is on the track, the cable is removed from the snatch block, and the car is pulled by the cable up to the hoist house, and dropped back on the supply track on which it was caused to drift to a place where it was carried by electric current to the mouth of the mine.

The day preceding the accident, Waldron, who had assisted in removing a shipment of mine cars from the railroad car and over the tracks to the foot of the incline, had been given instructions by Jess Williams, his immediate superior, regarding the use of the snatch block and how to fasten the latch. On the morning of the accident Williams, Waldron and another had been engaged in moving mine cars to the supply tracks by means of the cable. Two cars had been so delivered. After the cable had been returned to the foot of the incline, Jess Williams told Waldron to take the snatch block and put it on the rails. The block was chained to the outside rail of the sand track, part of the "Y". This gave a straight pull over and onto the lower end of the other branch of the "Y". The cable was inserted in the snatch block and the end fastened to the car that was being taken across the track in preparation to being placed on the incline track. The mine car was being readied in the normal manner.

Williams asked Waldron if he was ready, and he said he was. Then Williams told him to signal for the pull. Waldron stepped over the track from the snatch block to the post upon which the signal button was located almost directly opposite the snatch block and the elbow in the cable made by it, and pushed the signal button twice as a signal to the hoist man to apply the current. In response to the signal the current was applied, but the mine

car did not move, the cable became disengaged from the snatch block, and snapped taut, striking Waldron on the back of the neck just below the ear. Waldron's neck was broken by the blow caused by the straightening of the cable, and he died the following morning.

Neither Williams nor the hoist man, both men of experience, had encountered such an accident before. They had seen the cable break on former occasions, but never saw it become disengaged. This cable was not broken, nor was the safety latch broken. However, it appears that the block, or band, to which the latch was attached had been bent back at an angle. This had to be straightened before the safety latch would again engage the locking lug. The above repair was made shortly after the accident, in order that the remaining new cars could be transferred from the unloading point to the supply track on the hill. The two rivets (size or location not indicated), which had been torn out had not been replaced at the time of the trial.

The plaintiff in error takes the primary position that there is no liability as a matter of law, because decedent was not employed, suffered, or permitted to work "in any mine" in violation of Chapter 58, Acts 1943, in that his work had been outside the mine at all times.

The word "mine" has been incorporated in the list of places where minors under certain ages were not permitted to be employed in every child labor enactment since the original act, 1887, except that of 1911. Its omission in the latter is accounted for by the presence of a specific provision in the Mining Act, 1907, Chapter 78, that "no boy under fourteen years of age * * * shall be permitted to work in any coal mine, * * *". In the revision of the Mining Act, 1915, Chapter 10, the above prohibition was retained, another section added relating to minors under sixteen, and another section defining the scope of the word "mine". Section 85. reads: "Mine: *In this act* the term *'mine'* includes the shafts, slopes, drifts, or incline planes connected with excavations penetrating coal stratum or strata, which excavations are ventilated by one general air current, or divisions thereof, and connected by one general system of mine railroads over

which coal may be delivered to one or more points outside the mine, when such is operated by one operator." (Italics added.) The word "mine", however, was restored to its original place with other listed occupations in the Child Labor Law of 1919. On its next revision, the Mining Act (Acts, 1925, Chapter 88) omitted all reference to child labor, but retained, in Section 70, the definition of "mine", quoted above. The Child Labor Law of 1919, and the portion of the Mining Act, 1925, in so far as it related to coal mines, were carried into the Code, 1931, forming Code, 21-6, and Code, 22-2, respectively. The only change in the definition of "mine" (Code, 22-2-1) is in the opening part of the sentence, i. e., *In this article* the term 'mine' * * *". (Italics supplied.) The Child Labor statute was amended and reenacted in 1939 (Acts, Chapter 75), increasing the age limit in Section 2 from sixteen to eighteen, and making certain other changes therein, to which we shall refer later. And in 1943 (Acts, Chapter 58), a slight change, not material to the instant case, was made in said Section 2.

During the period 1911-1919 in which the mining statute alone covered child labor in mines, two cases which have a bearing on the instant one were before this Court. One was under the Act, 1907, (*Daniels* v. *Fuel Co.*, 79 W. Va. 255, 90 S. E. 840), and the other under the act of 1915 (*Mangus* v. *Coal Co.*, 87 W. Va. 718, 105 S. E. 909). In the *Daniels* case this Court held that "in any coal mine" did not mean "in or about a coal mine". The *Mangus* case concerning Chapter 10, Acts of West Virginia Legislature, 1915, involved a boy under fourteen. The Court there held that the words "in any coal mine" must be considered in the light of the definition of the word "mine" included in the Act of 1915, and interpreted the words "in any coal mine" to include an incline plane.

In the instant case we are confronted with the language found in Section 2 of the Child Labor Law, Acts 1939, as amended and reenacted in Acts 1943, i. e., "No child under eighteen years of age shall be employed, permitted or suffered to work in any mine, quarry or tunnel; or in, about,

or in connection with any of the following:" (Here follows a list of occupations not connected with mining.)

In view of the fact that the definition of "mine", contained in the mining statute (Code, 22-2-), is expressly limited to its use in that article by the words: "In this article", that statute cannot be read in *pari materia* with Code, 21-6 (the Child Labor Law), upon the violation of which this action is based. Code, 21-6, contains no definition of "mine". In the *Mangus* case as heretofore noted, the mining statute, West Virginia Acts of the Legislature, 1915, Chapter 10, contained both a definition of "mine" (Section 85) and a child labor provision (Sections 32 and 33). In this regard the instant case should be distinguished from that case.

It must be noted that both Section 1 and Section 2, Chapter 75, Acts 1939, use the expression "in, about, or in connection with" in dealing with certain named occupations, and in Section 2, in dealing with mines, quarries and tunnels, uses the expression "in any mine * * *". This shows that the Legislature has used the several expressions advisedly, and intended to limit its prohibition, in regard to mine, quarry or tunnel, to work done "in any mine", and not work done "about, or in connection" therewith. In the *Daniels* case, the Court said: "The legislative intent is ascertainable, we think by reference to the use of like or similar words in other statutes relating to the employment of child labor, for instance, in sections 71 and 72, chapter 15-H, serial sections 530 and 531, respectively, Code, 1913, which we had under consideration in *Rhodes* v. *J. B. B. Coal Co.* supra." (p. 258). In the instant case the difference in terms is incorporated in the enactment itself.

We see no merit in plaintiff's contention that the last paragraph of Code, 22-2-1, renders nugatory the effect of the specific limitation contained in the first paragraph thereof, defining "mine". It reads: "Unless otherwise expressly provided, the provisions of *this article* shall apply to all coal mines." (Italics supplied). This paragraph, as a reference to the Revisers' note reveals, simply means that the provisions of the article shall be applicable to all

mines, large or small, unless expressly otherwise provided.

Decedent's employment by defendant, in our opinion, was not unlawful within the meaning of Code, 21-6, as decedent was employed outside defendant's mine. The gravamen of the two counts contained in the declaration has not been sustained. This renders moot all other questions raised by counsel for the plaintiff in error.

The judgment of the trial court is reversed, the verdict set aside, and a new trial awarded.

*Judgment reversed; verdict set aside; new trial awarded.*